Argued August 25, affirmed October 16, 1978

## BURKS, *Claimant-Petitioner,*
*v.*
## WESTERN IRRIGATION & EQUIPMENT COMPANY, *Employer-Respondent.*
## (No. 76-4470, CA 10785)

586 P2d 788

Samuel A. Hall, Eugene, argued the cause for claimant-petitioner. On the brief were Coons & Anderson, and Allan H. Coons, Eugene.

R. Ray Heysell, Medford, argued the cause for employer-respondent. With him on the brief was Collins, Velure & Heysell, Medford.

Before Richardson, Presiding Judge, and Lee and Joseph, Judges.

JOSEPH, J.

**JOSEPH, J.**

The issue in this Workers' Compensation case is whether claimant, who is not totally disabled by virtue of his physical problems, is nonetheless within the odd-lot category because of his injury-related emotional problems.

In *Wilson v. Weyerhaeuser,* 30 Or App 403, 411-12, 567 P2d 567 (1977), the court observed:

> "*Extent of Disability.* Mental or emotional condition is often a contributive factor to incapacitation and the severity of the mental condition may affect the extent of disability. Such conditions may range in severity from psychopathological conditions such as chronic depression at one end to self-pity, malaise or loss of ambition at the other. The former class of recognized forms of emotional disturbances are significant elements in the assessment of the extent of disability in odd-lot cases where they complement the physical injury. If caused by the industrial accident, mental or emotional conditions may themselves constitute the injury. *See, e.g., Elliott v. Precision Castparts,* 30 Or App 399, 567 P2d 566, *rev den* (1977).

> "The emotional states at the less severe end of the spectrum may reflect and be subject to claimant's exercise of will. As such, the injury is not causal—it merely gives opportunity for expression of common work avoidance desires. These mental states are not pathological, but attitudinal. The claimant's attitude toward a return to work, if positive, may be relevant in assessing whether the condition excludes the claimant from the labor market or, if negative, whether the claimant is excluded from employment by his or her own will rather than by that of employers.

> " 'A broken body can cause a broken spirit,' *Seaberry v. SAIF,* 19 Or App 676, 683, 528 P2d 1103 (1974), and the point on the spectrum between psychopathological and attitudinal breakage at which each case falls is a question of degree which the fact finder must infer from all the evidence. That evidence should be considered in all its variety, free from the limiting semantical framework of 'motivation.' The use of the term should be abandoned except to convey its specific meaning.

[ 589 ]

"Therefore, we conclude that evidence of the existence or absence of motivation is not essential to the establishment or disproof of a claim of permanent total disability. Rather, when odd-lot status is in issue and such evidence is offered, it is to be weighed by the fact finder, free from talismanic significance and procedural consequences, along with all other evidence from either party which reflects on the existence, nature and scope of disability."

This claimant's "motivation" for rehabilitation and return to work have been repeatedly questioned. He does have substantial pain in his back and legs, and numbness in his legs causes loss of balance and falls. However, he has refused to do exercises and to employ devices which have a proved potential for decreasing pain. He views himself as severely disabled. He has not attempted to return to his job as a barber since his last laminectomy. The evidence strongly suggests that claimant does not mind his current daily routine, which includes driving his wife to work, returning home to play with his citizens' band and ham radios, driving back to have lunch with his wife, doing light housework and playing guitar with his friends.

A clinical psychologist offered direct and detailed testimony concerning claimant's emotional problems. His testimony can be fairly summarized as follows: Claimant's pain behavior has been unconsciously reinforced by his wife and by the fact that it gives him an excuse for his feelings of inadequacy and loss of masculinity. Though claimant lacks the emotional resources to return to work on his own, he has no psychological problems which would prevent his performing regular employment if he could be somehow motivated to obtain and do work. Parts of his testimony merit quotation:

"Q. And apparently he did feel he was not able to involve himself in a program of rehabilitation. To what extent does he have control over his own motivation, given the history in this particular case of a gradual deterioration of his physical condition with an emotional response to that condition?

"A. Well, I think that's difficult to really answer, because it depends on one's resources. There are many people, for example, who have a very similar picture of themselves when they enter a place like the Pain Center, and they are able to change that picture. These are people that are very alike Mr. Burks, have either psychophysiologic or conversion type reaction as far as their psychological makeup goes, who are depressed and so forth, and because of resources that they do have, are able to respond to what is being taught and to use them very readily. It's very difficult, therefore, to really answer that. It depends pretty much on the individual and the kinds of resources they have. I'm talking about emotional resource.

"Q. Yes. Would it be fair to say that based on his experience at the Pain Center, he apparently lacked the resources to be able to benefit?

"A. He seemed to lack motivation.

"Q. How does that come about psychologically? Can you explain that lack of motivation?

"A. Well, there can be a number of sources. One could very well relate to the secondary gains that one is obtaining from the symptoms, so that one is really not motivated to change. Certainly, depression can have something to do with this. And Mr. Burks—and Mr. Burks case, an anti-depressant was prescribed for him to increase his energy level and, hopefully, to deal more effectively with his depression. So, again, it's very difficult to answer for people in general. But I would say the secondary gains would have more to do with motivation than anything else.

"Q. And earlier you indicated that's not a conscious process.

"A. That's right. Or at least not necessarily.

"Q. Do you have an opinion in this particular case whether it is a conscious process or not?

"A. I felt that it was not a conscious process.
"* * * * *

"Q. He appears to be a person who lacks the personal resources to deal with the combination of circumstances in which he finds himself and get himself involved in some jobs, is that correct?

"A. I think that's a fair description.
"* * * * *

[ 591 ]

"Q. Doctor, would it be your opinion that if Mr. Burks were to become reemployed that it would help his present psychological condition?

"A. It could, simply because it might serve to combat some of his underlying feelings of inadequacy. It could, if he were engaged in something successfully and if he happened to derive some satisfaction from it along those terms, I think that's possible.

"Q. And is it your opinion that Mr. Burks present psychological condition is not such that it precludes him from a return, or does not preclude him from having the capabilities to perform adequately at a position?

"A. I think that's correct.

"Q. In other words, he does have the psychological capabilities at this time to perform a job adequately?

"A. Yes. Again, depending on how he does on the job.

"Q. Is it your opinion that if Mr. Burks does not return to the job market, that in his present situation, because of his wife and his present attitudes, that his condition will probably not improve?

"A. Would you repeat that? I'm sorry.

"Q. Yes. It was even garbled to me. Is it your opinion that if Mr. Burks does not return to the job market, that in his present condition, living conditions, including that of his wife, that his psychological condition will probably not improve?

"A. Oh, I would agree to that, that he would remain pretty much the same, yes, and I would think even become more entrenched in a disabled role."

## Claimant's treating physician concluded:

"Most people who have seen this patient feel that he is moderately disabled with a residual functional capacity to do light work. However, the patient's emotional status makes it impossible for him to do anything.

"* * * * *

"I feel this patient does have a severe permanent partial disability, even though some of this undoubtedly is functional in nature. I do not feel this patient would be helped with any psychiatric investigation since he totally denies the psychological aspects of the problem. However, I do feel this case should be closed since he is stable and perhaps the claim closure will spur this

[ 592 ]

patient on to attempt some type of light work. * * * I feel he would be wise to try doing some barbering. In general terms I told the patient that the onus was on him as to whether he wanted to make himself an invalid or not."

ORS 656.206(3) states:

"The worker has the burden of proving permanent total disability status and must establish that he is willing to seek regular gainful employment and that he has made reasonable efforts to obtain such employment."

The activities that claimant is able to do are consistent with a capability for gainful employment if he would but try. *See Christensen v. Stayton Canning Co.,* 31 Or App 1291, 572 P2d 366 (1977). Considering all the evidence, we conclude that claimant has failed to carry his burden of proving that his psychophysiological condition together with his physical injuries prevent him from finding and maintaining employment. The Board's 70 percent award for unscheduled disability fairly reflects claimant's physical disability.

Affirmed.